IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DINNAH CRICK DALTON, | ) | CASE NO. 3:15-cv-00179 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Dinnah Crick Dalton ("Plaintiff" or "Dalton") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her application for Supplemental Security Income. Doc. 1. This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to

the consent of the parties. Doc. 17. As explained more fully below, the Court **AFFIRMS** the

Commissioner's decision.

### I. Procedural History

Dalton protectively filed an application for Supplemental Security Income on March 19,

2012.[1] Tr. 22, 234-242, 335. Dalton alleged a disability onset date of March 2, 2004. Tr. 22,

234, 335. She alleged disability due to high blood pressure, mental problems (bipolar, manic

depression, schizophrenia), hip problems (arthritis), knee problems, and allergies. Tr. 104-105,

117, 151, 154, 339. Dalton's application was denied initially and upon reconsideration by the

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 12/9/2015).

state agency.  Tr. 151-153, 154-156.  Dalton requested an administrative hearing.  Tr. 157.  On

September 11, 2013, Administrative Law Judge William Wallis ("ALJ") conducted an

administrative hearing.  Tr. 49-90.

In his November 20, 2013, decision, the ALJ determined that Dalton had not been under

a disability since March 19, 2012, the date the application was filed.  Tr. 19-48.  Dalton

requested review of the ALJ's decision by the Appeals Council.  Tr. 7-18.  On November 24,

2014, the Appeals Council denied Dalton's request for review, making the ALJ's decision the

final decision of the Commissioner.  Tr. 1-6.

## II. Evidence[2]

### A.    Personal, educational and vocational evidence

Dalton was born in 1964.  Tr.  55, 234.  She completed approximately one year of

college.  Tr. 55.  Dalton worked in the past as a plumber.  Tr. 85, 383.  At the time of the

hearing, Dalton was living by herself in an apartment.  Tr. 67.  She was not married.  Tr. 55.

### B.    Medical evidence[3]

#### 1.    Treatment history

Dalton received mental health treatment through Lutheran Social Services ("Lutheran")

in 2009-2010.  Tr. 1250, 1347.  In November 2011, Dalton resumed mental health treatment at

Coleman Behavioral Health Services ("Coleman") (Lutheran's successor).  Tr. 1250, 1347.

---

[2] Dalton does not challenge the ALJ's findings regarding her alleged physical impairments.  Accordingly, the evidence summarized herein pertains generally to her alleged mental impairments.

[3] Prior to March 13, 2015, Dinnah Crick Dalton was known as David Crick Seymour.  *See* Tr. 243 – Probate Court of Allen County, Ohio Judgment Entry – Change of Name of Adult.  During the period following the filing of Dalton's application, she was in the process of preparing for a gender reassignment surgical procedure.  Tr. 460.  Thus, medical records refer to Plaintiff as David Crick Seymour as well as Dinnah Crick Dalton and refer to Plaintiff in both the masculine and feminine form.  Accordingly, some quotations from medical records contained herein refer to Dalton by her prior name and in the masculine gender.

On March 28, 2012, during a break at a group counseling session at Coleman, Dalton reported that she could not take it any more and was feeling suicidal and wanted to go to St. Rita's Medical Center. Tr. 1028-1030. Dalton's therapist escorted Dalton to the crisis center for assessment. Tr. 1030. Nancy Wallace, LSW, conducted an assessment at the crisis center. Tr. 1152-1169. Dalton reported that she had not been feeling right for several days. Tr. 1152. She reported past periods of daily suicidal thoughts and stated "I don't have the strength this time to fight it; I'm tired of fighting it." Tr. 1152. Dalton reported that she almost walked right out in front of traffic that day purposely which was a plan that she had been thinking about for two months. Tr. 1152. Dalton stopped herself and, while attending her group counseling session, reported her suicidal thoughts. Tr. 1152. Dalton reported being off psychotropic medication due to a lack of Medicaid coverage. Tr. 1152. Ms. Wallace's assessment included diagnoses of alcohol dependence, generalized anxiety disorder, and depressive disorder NOS. Tr. 1167. Upon consultation with Dr. Roy and Dr. Camino-Gaztambide, Dalton was admitted for psychiatric hospitalization at St. Rita's under Dr. Camino-Gaztambide's care. Tr. 1167, 1168.

On admission, Dr. Camino-Gaztambide indicated that Dalton had previously been hospitalized in 2007.[4] Tr. 865. Dalton had a history of substance abuse and alcohol dependence. Tr. 865. Dalton reported not drinking since the prior summer and not using any type of street drugs. Tr. 865. She was living at a halfway house. Tr. 865. On admission, Dalton's diagnoses included bipolar disorder, depressive episode and a history of alcohol dependence with a GAF

---

[4] Dalton was hospitalized on January 31, 2007, and discharged on February 3, 2007. Tr. 868-878. Her chief complaint was racing thoughts, mood swings, difficulty with concentration, difficulty falling asleep, and alcohol intoxication. Tr. 868. Dr. Roy, M.D., was one of her treating providers during her admission. Tr. 869. On discharge, Dr. Roy recommended that Dalton follow up with Lutheran and continue with her discharge medications. Tr. 869.

score of 35.[5]  Tr. 866.   Dalton was restarted on medication and responded well to the treatment

at the hospital and was discharged on April 3, 2012, with diagnoses of bipolar disorder,

depressive episode and history of alcohol dependence and substance abuse.  Tr. 863-864.  On

discharge, Dalton's GAF was 65,[6] and she was alert; oriented in place, time and person; her

affect was appropriate to content; her mood was almost euthymic; she was logical, coherent, and

relevant; she had no delusions or hallucinations; speech was not pressured; there was no flight of

ideas or ideas of reference; she had no suicidal ideations, death wish or wish to harm others; and

her cognitive functions were adequate and insight and judgment were improved from admission.

Tr. 863.

Following her discharge from St. Rita's on April 3, 2012, through at least 2013, Dalton

continued with nurse visits, group counseling and individual counseling sessions with therapists

at Coleman.  Tr. 1347, 1417-1724.  She was getting her medication boxes filled weekly by a

nurse for compliance and to lessen confusion.  Tr. 1347.

As part of her treatment at Coleman, on April 25, 2012, Dalton saw Dr. Sirkin.  Tr. 1237-

1244.  Dr. Sirkin noted that Dalton had a history of bipolar disorder that was complicated by

---

[5] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *Id.* GAF was removed from DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition.  Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

[6] A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR at 34.

multiple traumatic brain injuries.[7]  Tr. 1237.  Dalton was "relinking" to treatment after her

psychiatric hospitalization.  Tr. 1237.  Dalton had a history of DUI/OVI convictions and was on

probation at the time and was residing in a halfway house.  Tr. 1238, 1239.  Dalton denied

current alcohol and drug use.  Tr. 1237.  Dalton reported that her current medications were

helpful, her mood had stabilized, and she denied suicidal and homicidal ideations and psychosis.

Tr. 1237.  Dr. Sirkin's mental status examination findings included findings that Dalton was

overweight and unkempt.  Tr. 1241.  Otherwise, the mental status examination findings were

generally normal.  Tr. 1241-1242.  Dr. Sirkin's diagnoses were bipolar disorder, NOS; alcohol

dependence (early full remission); and tic disorder, NOS.  Tr. 1241-1242.  Dr. Sirkin assessed

Dalton with a GAF of 65.  Tr. 1243.

Dalton saw Dr. Sirkin again on July 9, 2012, for a scheduled MD follow-up visit.  Tr.

1232-1236.  Dalton had been seeing a nurse weekly for medication box management and was

active in both individual and group counseling.  Tr. 1232.  Dalton was prescribed Seroquel XR,

Celexa, and Depakote and she was taking over-the-counter Benadryl for anxiety.  Tr. 1232.

Dalton reported that her mood had been more upbeat and stable.  Tr. 1232.  However, she

reported continued weight gain from the Seroquel XR and was interested in knowing whether

there was another option.  Tr. 1232.  Dalton reported only minimal benefit from the Benadryl for

her anxiety and was interested in trying Vistaril.  Tr. 1232.  Dalton was happy with her other

medications.  Tr. 1232.  She reported fewer anxiety attacks but noted that her anxiety could still

be severe at times.  Tr. 1232.  Dalton denied psychotic symptoms, suicidal and homicidal

ideation and alcohol or drug use.  Tr. 1232.  Mental examination findings were again generally

normal.  Tr. 1232-1233.  Diagnoses remained as bipolar disorder, NOS; alcohol dependence

---

[7] Dr. Sirkin noted that Dalton had multiple head injuries since age 8 leading to seizures and Tourette-like tic disorder.  Tr. 1237.

(early full remission); and tic disorder, NOS, with a GAF score of 65.  Tr. 1234.  Dr. Sirkin recommended discontinuing Seroquel and adding Abilify; continuing Celexa and Depakote, and adding Vistaril.  Tr. 1236.  Dr. Sirkin also recommended that Dalton continue with group and individual counseling.  Tr. 1236.

In November 2012, having met her goals, Dalton was discharged from Coleman's group alcohol and drug addiction program.  Tr. 1614-1619.  Dalton was interested in and continued with mental health treatment.  Tr. 1667-1724.

### 2.    Opinion evidence

#### a.    Treating sources

*Jonathan W. Sirkin. M.D.*

On May 3, 2012, psychiatrist Jonathan W. Sirkin, M.D., completed two forms.  Tr. 1245-1247, 1248-1250.  One form concerned Dalton's Anxiety Related Disorder (Tr. 1245-1247) and the other concerned Dalton's Depressive Disorder (Tr. 1248-1250).   Dr. Sirkin indicated that Dalton had been in therapy at Coleman Behavioral Health Services ("Coleman") since November 7, 2011.  Tr. 1250.  Dr. Sirkin noted that, prior to receiving treatment through Coleman, Dalton was a client at Lutheran Social Services.  Tr.  1250.

Dr. Sirkin indicated that Dalton's depressive syndrome was characterized by: anhedonia or pervasive loss of interest in almost all activities; appetite disturbances with an increase in weight; sleep disturbances; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; and hallucinations, delusions or paranoid thinking.  Tr. 1248.  In assessing Dalton's depressive disorder, Dr. Sirkin opined that Dalton had extreme limitations in activities of daily living;

maintaining social functioning; and maintaining concentration, persistence or pace.[8]  Tr. 1249.

Dr. Sirkin also rated Dalton's "[e]pisodes of deterioration or decompensation in work or work-

like setting which cause the individual to withdraw from that situation or to experience

exacerbation of signs or symptoms (which may include deterioration of adaptive behavior)" as

extreme.  Tr. 1249.   In support of his opinions, Dr. Sirkin noted that there were multiple reports

of hospitalizations due to increased panic, suicidal ideation with and without plan.  Tr. 1249.  Dr.

Sirkin also noted an increase in Dalton's tic disorder, with very extreme muscle facial and neck

tics.  Tr. 1249.  Dr. Sirkin indicated that Dalton's compliance had a lot to do with her inability to

stay focused.  Tr. 1250.  Dalton reported nine months sobriety but continued to have psychiatric

symptoms.  Tr. 1250.

In the other form, Dr. Sirkin opined that Dalton exhibited generalized persistent anxiety

accompanied by the following signs or symptoms: motor tension; autonomic hyperactivity;

apprehensive expectation; and vigilance and scanning.  Tr. 1245.  Dr. Sirkin also opined that

Dalton exhibited a persistent irrational fear of a specific situation resulting in a compelling desire

to avoid the dreaded situation.[9]  Tr. 1245.  Dr. Sirkin indicated that Dalton experienced (1)

recurrent severe panic attacks manifested by a sudden unpredictable onset of intense

apprehension, fear, terror and sense of impending doom occurring on average at least once per

week; (2) recurrent obsessions or compulsions that are a source of marked distress; and (3)

recurrent and intrusive recollections of a traumatic experience that are a source of marked

distress.  Tr. 1245.   As he did in his assessment regarding Dalton's depressive disorder, in

assessing Dalton's anxiety related disorder, Dr. Sirkin opined that Dalton had extreme limitations

---

[8] The available ratings were mild, moderate, marked and extreme, with extreme meaning "severe impairment of ability to function."  Tr. 1249.

[9] Dr. Sirkin did not identify the specific situation that Dalton feared.

in activities of daily living; maintaining social functioning; and maintaining concentration, persistence or pace.  Tr. 1246.  Dr. Sirkin also rated Dalton's "[e]pisodes of deterioration or decompensation in work or work-like setting which cause the individual to withdraw from that situation or to experience exacerbation of signs or symptoms (which may include deterioration of adaptive behavior)" as extreme.  Tr. 1246.

*Wendy Bauer, CNS-BC, and Subrata Roy, M.D.*

On July 1, 2013, psychiatrist Subrata Roy, M.D., Medical Director at Coleman Behavioral Health Services signed a Mental RFC Assessment and a form containing a series of questions concerning Dalton's mental health condition.  Tr. 1346-1351.  The July 1, 2013, Mental RFC Assessment form included the following notation: "Ms. Dalton is primarily seen by Wendy Bauer CNS-BC.  This has been reviewed & signed by Subrata Roy M.D. Psychiatrist Medical Director Coleman Behavioral Health Services."  Tr. 1351.

The questionnaire included the following information regarding Dalton's mental health treatment.  Tr. 1347-1348.  Dalton had received treatment at Lutheran in 2009-2010 and resumed services in November 2011 at Coleman (Lutheran's successor) for medication, therapy and treatment.  Tr. 1347.  Dalton was attending clinic visits every two to three months with a PRN.  Tr. 1347.  Dalton was getting her medication boxes filled weekly by a nurse for compliance and to lessen confusion and she was being seen in therapy by a counselor.  Tr. 1347.  Dalton's symptoms and diagnoses included: bipolar disorder; alcohol dependence in full remission; tic disorder; racing thoughts; suicidal ideation with no current plan but forms plan and intent frequently requiring hospitalization and crisis intervention; confusion; depression; anxiety; self-isolation; and mood swings.  Tr. 1347.  It was noted that Dalton had multiple physical, psychosocial and psychological limitations.  Tr. 1347.  Transgendering had been a positive in her

life but also included negatives. Tr. 1347. Dalton was continuing to have suicidal and racing thoughts. Tr. 1347. Her problems had not gone away. Tr. 1347. Dalton would be unable to perform any activities without limitation because her mental health issues consumed her day-to-day activities and she had social anxiety, social phobias, panic attacks, and anxiety attacks.[10] Tr. 1348. Dalton's condition was characterized by a frequent need for individualized counseling; increased suicidal ideation with no current active plan; and difficulties with going through the transgendering process. Tr. 1348.

In the Mental RFC Assessment, Dalton's functional abilities were rated in 20 categories. Tr. 1349-1350. Dalton was rated as moderately limited in 6 categories[11] and markedly limited in 14 categories.[12] Tr. 1349-1350. Included in the Mental RFC Assessment was a statement that:

> Ms. Dalton has difficulty in social settings, difficulty interacting [with] 3-5+ people. Becomes isolating, depressed. Has always been an issue – used to drink to lessen anxiety. Doesn't drink, therefore this is again a struggle.
>
> Not recommended for employment, not physically or mentally.

Tr. 1350.

---

[10] It was also noted that Dalton had a history of traumatic brain injury and walked with a cane due to hip dysplasia. Tr. 1348.

[11] The 6 categories were (1) ability to remember locations and work-like procedures; (2) ability to understand and remember very short and simple instructions; (3) ability to carry out very short and simple instructions; (4) ability to make simple work-related decisions; (5) ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and (6) ability to travel in unfamiliar places or use public transportation. Tr. 1349-1350.

[12] The 14 categories were (1) ability to understand and remember detailed instructions; (2) ability to carry out detailed instructions; (3) ability to maintain attention and concentration for extended periods; (4) ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (5) ability to sustain an ordinary routine without special supervision; (6) ability to work in coordination with or proximity to others without being distracted by them; (7) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (8) ability to interact appropriately with the general public; (9) ability to ask simple questions or request assistance; (10) ability to accept instructions and respond appropriately to criticism from supervisors; (11) ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (12) ability to respond appropriately to changes in the work setting; (13) ability to be aware of normal hazards and take appropriate precautions; and (14) ability to set realistic goals or make plans independently of others. Tr. 1349-1350.

### b.    Consultative sources

_Richard Litwin, Ph.D._

On April 13, 2012, shortly after Dalton had been hospitalized at St. Rita's, Licensed

Clinical Psychologist Richard Litwin, Ph.D., conducted a consultative neuropsychological

evaluation (Tr. 825-829) to assess her "cognitive functions to determine if there [were] any

residual effects from prior head injuries which might impact vocational planning, and to

determine if [he] employable." (Tr. 825).  At the time of the evaluation, Dalton was residing

at a halfway house.  Tr. 826.  Dr. Litwin conducted various tests to assess intellectual functions;

aptitude skills; memory abilities; executive functions; and emotional functioning.  Tr. 826-828.

Dr. Litwin's assessment included diagnoses of bipolar disorder (per history) with psychotic

features and a history of alcohol abuse in early sustained remission.  Tr. 828.  Dr. Litwin

assessed a GAF score of 55.[13]  Tr. 828.  In summary, Dr. Litwin opined:

> Neurocognitive testing did not find signs of cognitive impairment.  Working
> memory and new learning/memorization skills appear in tact under structured
> testing conditions.  David had no trouble deploying and staying focused during
> testing.  In daily life should anxiety, depression or chronic pain symptoms spike,
> concentration and memory may be derailed.
>
> Aptitude testing found low average IQ with language skills at the later high
> school level or above.  Math skills were weaker falling at the 8th grade level.
> There was no evidence of acquired aphasia, stuttering or poor oral fluency.
>
> Based upon the above academic/IQ testing, David may not be an ideal candidate
> for a challenging four year college degree.  He may better able to do well in a
> long term certification or Associates degree program focused on practical skills.
> David's principal disabilities are less cognitive and more related to his mental
> health status and bipolar disorder.  He presents as emotionally brittle with low
> tolerance for stress.  While it is difficult to say if David is doing substantially
> better, he continues to report significant emotional distress including auditory
> hallucinations.  Moreover, David was only recently released from the psychiatric

---

[13] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or
school functioning.  DSM-IV-TR at 34.

hospital which suggests that continued work on stabilization should be a primary focus for the near term.

Given David's emotional status, I am not confident that he would be employable at this time. He needs to continued mental health treatment with a focus on decreasing his hallucinations and moodiness. I would encourage David to explore volunteer work under low stress conditions to see how well he can manage external demands. Especially, since he had not worked in years. As with many individuals who have bipolar disorder, David will function best in low stress environment, being able to maintain regular sleep schedule, avoiding night shift work, avoiding any drugs or alcohol, and being able to work at his own pace in relative isolation but around others if possible.

Tr. 828-829.

### *Albert E. Virgil, Ph.D., J.D.*

On June 25, 2012,[14] Clinical Psychologist Albert E. Virgil conducted a consultative psychological evaluation. Tr. 1298-1302. Dr. Virgil's assessment included diagnoses of major depression, recurrent, severe, with psychotic features and a GAF of 58. Tr. 1301. Dr. Virgil indicated that Dalton did not appear to exaggerate symptoms or respond in a manner that suggested self-report unreliability. Tr. 1301. However, Dr. Virgil noted that Dalton had been inconsistent regarding her substance abuse history. Tr. 1301. In summary, Dr. Virgil opined:

Mr. Seymour stated "mental and physical, and eventually 'bipolar, manic depression' and 'psychotic episodes' as disabilities. Bipolar disorder was not apparent and Mr. Seymour did not present with psychotic features at the time of the session. Mood was depressed and mildly anxious. He is being treated with anti convulsive, anti psychotic and anti depressant medications and psychotic symptoms appear to be in partial remission. Significant cognitive slippage was not evidenced and intelligence is estimated to be within the average level.

Tr. 1301.

---

[14] Page 1 of Dr. Virgil's six page evaluation is not included in the transcript. Pages 2 through 6 of the evaluation do not reflect the date of the evaluation. Tr. 1298-1302. The ALJ's decision indicates that the evaluation occurred in June 2012. Tr. 34. Noting that a page from Dr. Virgil's evaluation is not included in the transcript, Plaintiff also notes that Dr. Virgil conducted the evaluation on June 25, 2012. Doc. 16, p. 9. Plaintiff claims that Defendant should be ordered to supplement the transcript with the missing page. Doc. 22, p. 2. However, Plaintiff does not claim that information included on the missing page would materially effect the Court's review.

As part of his evaluation, Dr. Virgil assessed Dalton's functional abilities in four categories. Tr. 1302. In doing so, Dr. Virgil concluded that: (1) Dalton was able to understand and carry out instructions; (2) Dalton had adequate attention and concentration skills; (3) Dalton was cooperative during the evaluation and appeared amenable to supervision; had friends and, based on her behavior during the session, seemed capable of working alongside coworkers; and (4) based on Dalton's report and overall clinical presentation, Dalton appeared mentally and emotionally capable of responding appropriately to work setting pressures. Tr. 1302.

### c. State agency reviewers

On July 5, 2012, state agency reviewing psychologist Cynthia Waggoner, Psy.D., completed a Psychiatric Review Technique ("PRT") and Mental RFC Assessment. Tr. 108-109, 112-113. In the PRT, Dr. Waggoner opined that Dalton's affective disorder resulted in mild restrictions/difficulties in activities of daily living and in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. Tr. 109. In the Mental RFC Assessment, Dr. Waggoner opined that Dalton had no limitations in understanding and memory; no limitations in social interaction; and no limitations in adaptation. Tr. 112-113. In the category of concentration and persistence, Dr. Waggoner opined that Dalton had moderate limitations in ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances and moderate limitations in ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 112-113. Dr. Waggoner indicated that "[d]ue to mood and PTSD, clmt can perform simple to moderately complex tasks in a static work environment that does not have strict production demands." Tr. 113.

On September 19, 2012, upon reconsideration, state agency reviewing psychologist Aracelis Rivera, Psy.D., also completed a PRT and Mental RFC Assessment.  Tr. 124-125, 128-129.  Dr. Rivera's opinions mirrored Dr. Waggoner's PRT and Mental RFC Assessment.   Tr. 124-125, 128-129.

**C.      Testimonial evidence**

**1.      Dalton's testimony**

Dalton was represented by counsel and testified at the hearing.  Tr. 54-84.   Dalton stated that she was unable to work due to severe pain in her back and hip, severe arthritis in her hands, inability to be around five plus people because of social anxiety disorder, confusion, disorientation, and memory loss.  Tr. 56-57.   When asked whether she thought the medication she was taking was helping, Dalton suggested that her medication was not helping, stating "This is the seventh time that I've changed medications and I'm about due for another change because I am resorting back to deeper manic depression, isolation."  Tr. 61-62.   However, she agreed that her mental health conditions would be worse if she stopped taking all of her medication.  Tr. 62. Dalton indicated that she has memory issues. Tr. 64-65.  She is unable to sit through and pay attention to an entire hour and half to two hour long movie.  Tr. 65.  With respect to her inability to be around five or more people, Dalton indicated she is more comfortable if she knows the individuals.  Tr. 66.  Dalton stated that it would be extremely difficult for her to work in a job that involved intermittent interaction with members of the public for approximately two and a half hours throughout the day because she starts to tingle and sweat and sometimes blanks out. Tr. 66.

Dalton indicated that, starting in 2003, she has been hospitalized approximately five or six times for psychiatric decompensations.  Tr. 71-73.  Over the years, she has received treatment

for her psychiatric problems on and on and off basis.  Tr. 74.  At the time of the hearing, she was

seeing Wendy Bauer at Coleman every two to three months.  Tr. 74-75.  Dalton indicated that

Ms. Bauer practices under the direction of Dr. Roy and stated that she has met with Dr. Roy.  Tr.

75.  Dalton indicated that, when her anxiety increases, her Tourette's syndrome symptoms

worsen.  Tr. 75-77.

Dalton experiences both manic and depressive episodes.  Tr. 78.  At times, she has racing

thoughts and difficulty falling asleep and, at other times, she sleeps excessively.  Tr. 78, 80.

Dalton acknowledged her history with alcohol abuse.  Tr. 69-70.  She reported having

received help and being sober for about two years.  Tr. 70.  Dalton indicated that she no longer

turns to alcohol when something traumatic happens.  Tr. 79.  She added that, since becoming a

woman, stress and needing alcohol has been eliminated, which has been positive.  Tr. 79-80.

However, her anxiety is still high.  Tr. 80.  She has a hard time watching television because of

racing thoughts.  Tr. 80.  She can only watch television for about a half hour at a time.  Tr. 80.

She is able to concentrate for longer periods of time while online, possibly for a couple hours.

Tr. 80-81.

Dalton explained that a typical day included waking, eating a little bit, using the

bathroom, chatting on the internet with friends, watching television, listening to the radio or

reading.  Tr. 68.  Dalton estimated being on the internet for about one-third of her day.  Tr. 68.

She has friends who come over and help her with housework.  Tr. 68.  When she goes grocery

shopping, she goes with someone.  Tr. 69.  Because of her health problems, Dalton has pretty

much stopped attending social gatherings and does not really shop in malls any longer.  Tr. 69.

She does see friends about once a week but stated that those visits were much more frequent in

the past.  Tr. 81-82.  On occasion, Dalton isolates herself and does not want to see anyone for

periods of time and lets everything, like showering, go. Tr. 82. As an example, Dalton stated that, during the prior winter, she did not open the front door for four days. Tr. 82.

### 2. Vocational Expert's testimony

Vocational Expert ("VE") Richard Astrike testified at the hearing. Tr. 84-88. The VE indicated that Dalton's past work was that of a plumber, which the VE described as a heavy, skilled position. Tr. 85.

The ALJ asked the VE to assume a hypothetical individual of the same age, education, and work background as Dalton who could lift, carry, push, pull 10 pounds occasionally and 10 pounds frequently; stand and/or walk 2 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; could perform no work using the left lower extremity for foot pedals; could only occasionally push or pull with the left lower extremity; could occasionally climb ramps and stairs; could never climb ladders, ropes, scaffolds; could occasionally balance; occasionally stoop; never kneel, crouch or crawl; should have no exposure to unprotected heights or moving machinery; could understand, remember, and carry out simple and/or detailed, but not complex, tasks and instructions; could sustain concentration and attention for those simple and/or detailed tasks and instructions; could interact adequately with supervisors and coworkers and occasionally with the general public; could respond appropriately to occasional workplace changes; and could have no strict production quotas. Tr. 85-86. The VE indicated that the described individual could perform the following sedentary jobs: (1) sorter, with approximately 4,000 available in Ohio and 100,000 nationwide; (2) inspector, with approximately 5,000 available in Ohio and 80,000 nationwide; and (3) hand packer, with approximately 8,000 available in Ohio and 100,000 nationwide. Tr. 86-87.

For his second hypothetical, the ALJ asked the VE to add to this first hypothetical the following restrictions – the individual could understand, remember, and carry out just simple tasks and instructions; concentration, attention and persistence would be just for those simple tasks as well; interaction with supervisors and coworkers would be changed to occasional; and no interaction with the general public.  Tr. 87.  The VE indicated that those additional restrictions would not impact the availability of the jobs identified in response to the first hypothetical.  Tr. 87.

For his third hypothetical, the ALJ asked the VE to add to the second hypothetical a limitation of missing one day per week due to health conditions.  Tr. 87.  The VE indicated that, with that additional limitation, there would be no work available for the individual.  Tr. 87.

In response to Dalton's counsel's questions, the VE indicated that he was unaware of a job that would be available to someone who was unable to work in coordination with or proximity to others without being distracted by them and the VE indicated that there would probably  be no jobs available to someone who was unable to accept instructions and respond appropriately to any criticism from supervisors.  Tr. 87-88.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy[15] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[16] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

---

[15] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[16] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 416.925.

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his November 20, 2013, decision, the ALJ made the following findings:[17]

1. Dalton had not engaged in substantial gainful activity since March 19, 2012, the application date.  Tr. 24.

2. Dalton had the following severe impairments: affective/mood disorder, anxiety disorder, osteoarthritis, and disorder of the nervous system.  The following impairments were non-severe:  schizophrenia, dependent personality disorder, Tourette's syndrome/tic disorder, chronic allergies and seizures, hypertension, and substance abuse.  Tr. 24-26.

3. Dalton does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 26-28.

4. Dalton had the RFC to lift, carry, push, pull 10 pounds occasionally, 10 pounds frequently; stand and/or walk two hours in an eight-hour workday; sit six hours in an eight-hour workday.  Dalton can perform no work using the left lower extremity for foot pedals.  Dalton can only occasionally push/pull with the left lower extremity.  Dalton can occasionally climb ramps and stairs; but never climb ladders, ropes, scaffolds.  Dalton can occasionally balance; occasionally stoop; never kneel, crouch or crawl.  Dalton can have no exposure to unprotected heights or moving machinery.  Dalton can understand, remember and carryout simple tasks and instructions; sustain concentration, attention and persistence for simple tasks as well.  Dalton can have occasional interaction with supervisors and coworkers, but never with the general public.  Dalton can respond appropriately to occasional workplace changes.  Dalton can perform no strict production demands.  Tr. 28-38.

5. Dalton is unable to perform any past relevant work.  Tr. 38.

6. Dalton was born in 1964, and was 47 years old, which is defined as a younger individual age 45-49, on the date the application was filed.  Tr. 38.

7. Dalton has at least a high school education and is able to communicate in English.  Tr. 38.

---

[17] The ALJ's findings are summarized.

8.    Transferability of job skills is not material to the determination of disability. Tr. 38.

9.    Considering Dalton's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Dalton could perform, including sorter, inspector, and hand packer. Tr. 38-39.

Based on the foregoing, the ALJ determined that Dalton had not been under a disability since March 19, 2012, the date the application was filed. Tr. 39.

## V. Parties' Arguments

Plaintiff asserts that both Dr. Roy and Dr. Sirkin treated her and she argues that the ALJ failed to weigh the opinions of Dr. Roy and Dr. Sirkin in accordance with the treating physician rule. Doc. 16, pp. 15-25, Doc. 22. Plaintiff also argues that the ALJ improperly favored the opinions of reviewing psychologists over those of her treating and examining sources (Drs. Roy, Sirkin and Litwin). Doc. 16, pp. 23-24.

Defendant disagrees with Plaintiff's contention that Dr. Roy should be accorded treating physician status, arguing that the ALJ properly concluded that, although Dr. Roy signed the assessments, Dr. Roy did not personally treat Dalton. Doc. 20, p. 10. Further, Defendant contends that the ALJ properly evaluated and weighed the medical opinion evidence and substantial evidence supports the ALJ's decision. Doc. 20, pp. 9-14.

## VI. Law & Analysis

### A.    Reviewing standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## B.  The ALJ properly evaluated the medical opinions

Dalton contends that the ALJ erred in his assessment of the medical opinion evidence. More particularly, she argues that the ALJ failed to weigh the opinions of Dr. Roy and Dr. Sirkin in accordance with the treating physician rule.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c )(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 416.927(c). However, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis." *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

### *Dr. Roy*

Dalton claims that Dr. Roy's assessment was entitled to controlling weight under the treating physician rule. Dalton contends that, while Dr. Roy may not have treated her, the treating physician rule should apply because Dr. Roy served in a supervisory role at Coleman and Lutheran (Coleman's predecessor). However, the Court finds that, as did the ALJ, that Dr. Roy was not personally treating Dalton at the time he signed the assessment. Tr. 37. Thus, due to the lack of ongoing treatment relationship between Dr. Roy and Dalton, the treating physician rule is not implicated.[18] *See Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005); *Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006).

---

[18] Plaintiff provides no transcript cite supporting her claim that Dr. Roy was providing ongoing treatment at the time he signed the assessment in 2013. The Court notes that, during Dalton's January 2007 hospitalization, Dr. Roy was one of Dalton's treating providers. Tr. 869. Also, it also appears that Dr. Roy was consulted when Dalton was

Although Dr. Roy's assessment was not entitled to treating physician status under the Regulations, the ALJ, consistent with his responsibility under the Regulations, discussed and explained the weight he assigned to Dr. Roy's opinion, stating:

> The opinion of Dr. Roy is given little weight, as it is not consistent with the evidence.  He found the claimant had marked limitations understanding and remembering detailed instructions and moderate limitations with simple instructions.  He found the clamant generally had marked limitations in sustained concentration and persistence, social functioning and adaptation.  He noted the claimant had multiple physical, psychosocial & psychological limitations as well as transgendering.  He noted the claimant was recently going through transgendering and was having a difficult time.   He reported the claimant had social anxiety and panic attacks.  He noted the claimant had a history of drinking to control anxiety, but was in remission.  He noted the claimant's facial tics were lessened but still present.  He noted the claimant was not recommended for employment, physically or mentally.  He noted the claimant was primarily seen by Wendy Bauer, CNS-BC and he only reviewed and signed the assessment.  Dr. Roy did not personally treat the claimant, but was only a consulting source to review and sign off on the assessment.  Furthermore, the assessment was not consistent with treatment notes, which indicated improvement in the claimant's symptoms.  Therefore, the assessment is given little weight.  (Ex. 37F).

Tr. 37.

In evaluating opinion evidence, an ALJ uses the factors set forth in 20 C.F.R. § 416.927. However, an ALJ is not obliged to include in his decision an exhaustive factor-by-factor analysis of the factors.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Here, the ALJ considered the fact that the extreme limitations contained in Dr. Roy's assessment were not supported by or consistent with the treatment notes which indicated improvement in Dalton's symptoms.    Contrary to Dalton's claim, the ALJ's decision is not based on vague and conclusory statements.  Rather, the ALJ's decision makes clear that the ALJ considered Dalton's treatment history, which reflected improvement in Dalton's symptoms and which the ALJ properly concluded was inconsistent with the extreme limitations contained in Dr.

---

admitted to St. Rita's in March 2012.  Tr. 1167.  However, these two instances do not establish an ongoing treatment relationship sufficient to entitle Dr. Roy's assessment to review under the treating physician rule.

Roy's 2013 assessment.  *See* Tr. 32-36 (ALJ's decision discussing Dalton's treatment history).

Dalton's claim that the ALJ improperly considered the fact that the longitudinal record generally

reflected GAF scores in the mild to moderate range is without merit.   Here, the ALJ did not

consider the GAF scores in isolation.  Rather, the ALJ considered the GAF scores along with the

opinion evidence and treatment records, which reflect improvement in Dalton's symptoms.

Based on the foregoing, the Court finds no error in the ALJ's evaluation of Dr. Roy's

July 1, 2013, assessment.

*Dr. Sirkin*

While Dr. Sirkin saw Dalton during the relevant time period, there were only two such

visits.  One visit occurred on April 25, 2012, (Tr. 1237-1244), shortly before Dr. Sirkin provided

his May 3, 2012, opinions (Tr. 1245-1250), and the second visit occurred on July 9, 2012 (Tr.

1232-1236). Thus, the ALJ properly concluded that Dr. Sirkin did not provide regular and

ongoing treatment for Dalton's mental health conditions (Tr. 37) and therefore, as discussed

above in connection with Dr. Roy, the treating physician rule is not implicated.  *See Daniels*, 152

Fed. Appx. at 490-491.  Notwithstanding the lack of an ongoing treatment relationship between

Dalton and Dr. Sirkin, consistent with the Regulations, the ALJ discussed and explained the

weight he assigned to Dr. Sirkin's opinion, stating:

> The opinion of Dr. Sirkin is given little weight, as it is not consistent with the
> evidence.  He opined the claimant had anxiety and depressive disorder with
> extreme limitations in activities of daily living, social functioning; concentration,
> persistence and pace; and episodes of deterioration or decompensation.  He noted
> the claimant's compliance had a lot to do with the claimant's difficulty staying
> focused.  He noted the claimant reported nine months of sobriety but continued to
> have psychiatric symptoms.   Dr. Sirkin did not provide regular and ongoing
> treatment for the claimant's mental health conditions.   His assessment is not
> consistent with the medical evidence, which shows the claimant's condition was
> generally controlled when compliant with treatment and medication management.
> Therefore, his assessment is given little weight.  (Ex. 26F).

Tr. 37.

The ALJ discussed in detail Dalton's mental health treatment history (Tr. 32-36) and concluded that that medical evidence was not consistent with or did not support Dr. Sirkin's extreme limitations.  While Dalton claims that the ALJ cherry-picked evidence, the Sixth Circuit has noted that the so-called cherry picking of evidence by the ALJ "can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir.2009).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted).   Also, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. 2004).

Based on the foregoing, the Court finds no error in the ALJ's evaluation of Dr. Sirkin's May 3, 2012, assessments.

Dalton also claims that the ALJ improperly weighed the opinion of one-time consultative examining psychologist Dr. Litwin and improperly assigned more weight to the state agency reviewing psychologists' opinions.  Doc. 16, p. 24.  These claims are also without merit.  While the "examining" and "treatment" relationship are factors to consider when weighing opinions, other factors to consider are supportability and consistency.  20 C.F.R. § 416.927(c).  As indicated, the ALJ considered the consistency and supportability of the opinion evidence and concluded that the evidence, including Dalton's mental health treatment notes, supported the state agency reviewing psychologists' assessments.  Tr. 36.  Additionally, the ALJ did not rely

solely on non-reviewing psychologists' opinions.  The ALJ gave some weight to the opinion of consultative examining psychologist Dr. Virgil, finding his opinion somewhat consistent with the evidence.  Tr. 36.  Moreover, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. § 416.945(a); 20 C.F.R. § 416.946(c).  "[T]he ALJ—not a physician—ultimately determines a claimant's RFC." *Coldiron v. Comm'r of Soc. Sec.*, 391 *Fed. Appx. 435, 439 (6th Cir. 2010).*  "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009).*  Here, consistent with the Regulations, when assessing Dalton's RFC, the ALJ considered the medical opinion evidence as well as Dalton's subjective complaints, treatment history, and activities of daily living.  Tr.  29-38.

Based on the foregoing, the Court finds that the ALJ properly considered and weighed the evidence, including the medical opinion evidence and the decision is supported by substantial evidence.  Dalton has not demonstrated a basis upon which to reverse or remand the Commissioner's decision.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

December 11, 2015

Kathleen B. Burke
United States Magistrate Judge